# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 04-22668-CIV-UNGARO-BENAGES
(Case No. 93-572-CR UUB)

MARSHALL IVES,

      Movant,

vs.

UNITED STATES OF AMERICA,

      Respondent.

_____/

## ORDER AFFIRMING MAGISTRATE JUDGE'S REPORT

THIS CAUSE is before the Court upon Ives's Motion Under 28 U.S.C. § 2255 to Vacate,

Set Aside, or Correct Sentence by a Person in Federal Custody.  DE 1.  The matter was referred

to Magistrate Judge Brown, who issued a Report (DE 43) recommending that the Motion be

denied.  Movant Ives filed timely objections to the Report (DE 44), which are addressed in turn.

## FACTS[1]

In December 1993, a federal grand jury in Miami, Florida returned an eleven (11) count

indictment against Marshall Ives ["Ives"] and fifteen (15) co-defendants.  Ives was charged with

participating in a pattern of racketeering activity with an enterprise engaged in activities which

affected interstate and foreign commerce, in violation of 18 U.S.C. 1962(c) (Count I), conspiring

to commit that offense, in violation of 18 U.S.C. 1962(d) (Count II), and with using and causing

---

[1] The following facts are adopted as stated in the Report (*see* DE 43 at 1-8); the parties
have not objected in this regard.  *See, e.g., LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th. Cir.
1988) (stating that "[f]indings of fact made by a United States magistrate under the authority of
28 U.S.C. § 636, and which are accepted and adopted by the district court without objection by
any party, may be reviewed on direct appeal only for 'plain error or manifest injustice.'").

the use of a facility in interstate and foreign commerce with the intent to promote, manage,

establish, and carry on the unlawful activity; and to facilitate the promotion, management,

establishment, and carrying on of the unlawful activity, in violation of 18 U.S.C. 1952(a)(3)

(Count VI).  Ives pled not guilty to all counts.

In January, 1995, former Assistant United States Attorney for the Southern District of

Florida, Myles Malman ("Malman") began representing Ives.[2]  On June 12, 1995, two days prior

to the start of Ives' trial, a hearing was held at which the parties addressed various conflict-of-

interest issues with regard to Malman's representation, at which the following colloquy occurred:

> MR. TROYER: There's one last thing.  One thing I've never gotten around to we
> need to do, I believe, and that is–I've discussed this with Mr. Malman a long time ago. ...
> Mr. Malman ... was employed by the Department of Justice while this case was pending.
> He never supervised any aspect of this particular case, and of course, it's entirely
> appropriate under the statute that he's allowed to be in this case as defense counsel.

> However, I think it's crucial that the Court get an on-the-record waiver from Mr.
> Ives himself that he still wants Mr. Malman to represent him knowing that situation.

> MR. MALMAN: I think that's correct, your Honor. ... [W]hen I first started
> having discussions with Mr. Ives about possibly taking the case, I brought this to his
> attention. ...  I immediately called [AUSA Toyer] up and ... I told him the issues that I had
> in the case were that there were potential Government witnesses that I had–well, one was
> Boris Olarte-Morales that I had interviewed at one point and Mr. Taboada I've
> interviewed on one occasion or been present for an interview of him on one occasion, and
> I believe in the severed Noriega codefendant trial, I may have examined him in the
> Noriega trial in chief.  Mr. Guy Lewis examined him.

---

[2] In the fall of 1994, Malman was in the process of relocating his law practice to Miami to join the firm of Dexter Lehtinen, who had been Acting United States Attorney for the Southern District of Florida from 1988 until he resigned in January of 1992.  From the time of Ives' arraignment until August 23, 1994, he was represented by Fred Schwartz, Esq. who was allowed to withdraw.  Between October 6, 1994, when Malman entered a temporary appearance, and January 3, 1995 when Malman's pro hac vice motion was granted, two other attorneys made appearances on [Movant]'s behalf.  Malman left Lehtinen's firm before Ives' trial commenced on June 14, 1995.

MR. TROYER: Actually Mr. Lewis examined him.

THE COURT: Let me ask you.  You're not going to argue to the jury Mr. Taboada's credibility based on the fact that he was previously a Government witness in a case in which Mr. Malman was involved, are you?

MR. TROYER: No, no, I wouldn't dream of it.

MR. MALMAN: Nor do I envision saying anything to Mr. Taboada on cross-examination, well, you know–I mean, there's nothing, because if there were–

THE COURT: Okay.  I just wanted to make sure about that.

MR. MALMAN: Yes.  You know, in these days, if there were any Brady, of course, in Mr. Taboada's case when I handled him or dealt with him, it was turned over to the defense and any Jencks was turned over.  He never said to me, well, I had any contact with him; by the way, there's this guy Marshall Ives, who did X, Y, and Z.  He never mentioned Mr. Ives' name to me or anything like that.

I've explained it to Mr. Ives.  I explained it to Mr. Troyer ...

MR. TROYER: I was present.  I saw him cross-examining in Judge Hoeveler's courtroom.

MR. MALMAN: But I did intend to vigorously cross-examine him in this case based upon this evidence and what we've been provided.

MR. TROYER: Also, Mr. Taboada did not directly implicate Mr. Ives.  He doesn't give any testimony directly as to him.

As to the other witness, Mr. Olarte, we don't intend calling him.  We've made that known months ago.

    *      *      *
[Defendant is sworn]

THE COURT: Mr. Ives, is it true that you and Mr. Malman have discussed this problem in some depth?

THE DEFENDANT: We discussed the Boris Olarte problem.

THE COURT: You know that Mr. Malman was a former United States Attorney.

3

THE DEFENDANT: Yes.

THE COURT: You know that Mr. Malman was the prosecuting attorney in the Noriega case.

THE DEFENDANT: Yes.

THE COURT: That he had attained had [sic] some seniority status in the U.S. Attorney's Office ... at the time that the case that's pending now before me was under investigation.

THE DEFENDANT: Yes, your Honor.

THE COURT: And you know that he's had some contact at least with Mr. Taboada and Mr. Olarte.

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you've discussed that with Mr. Malman.

THE DEFENDANT: Yes, your Honor.

THE COURT: And knowing that and these other matters, the greater details that have been discussed here today, is it still your choice that Mr. Malman be your counsel?

THE DEFENDANT: Yes, your Honor, as long as–but there were some items that were represented in reference to Boris Olarte and Gabriel Taboada that possibly were not true and might require some different action by Mr. Malman.  I want to make sure that those might be able to take place.

THE COURT: Well, I don't know what that means.

MR. MALMAN: Can I confer with my client for a moment, Your Honor?

THE COURT: Yes.

                *        *        *

MR. MALMAN: ... I have discussed with Mr. Ives, without revealing any confidence I've learned as a former Government lawyer, that I had a prosecutor-witness relationship as I've laid out on the record with ... Olarte-Morales and with ... Taboada. Those are the only two individuals that the Government listed on their list of witnesses that I have had such a relationship with.

4

THE COURT: And they're not calling Olarte-Morales.  They just told me that.

MR. MALMAN: ... What I'm saying is if there became a point in the trial where it became necessary for ... the defense to call Mr. Olarte-Morales, what I've explained to Mr. Ives is–and I'm not saying that is; I'm just trying to examine the potentiality of all possible conflicts, and I think this is where we're getting hung up–if there ever became the point of that, what I'm representing to the Court and what I would represent to the Government is that anything that Mr. Olarte-Morales had to do with the Noriega case is totally distinct and separate with anything that Mr. Olarte-Morales had to do with this case.  What Mr. Olarte-Morales had to do with the Noriega case is totally separate and apart ....

... and Mr. Olarte-Morales was not used as a witness in the Noriega case. ...

At this point we don't intend to call any witnesses, ...

*       *       *

MR. MALMAN: ... Now, what I'm saying to the Court and what I've discussed with Mr. Ives is that should Boris Olarte-Morales talk to us and should we want to talk to him, and should it ever become necessary for us to attempt to subpoena him, my relationship with the Government–I've explained to Mr. Ives–my former relationship will not prevent me in those areas in dealing with Mr. Olarte-Morales.

That's the bottom line involved in this case.  Whatever Mr. Olarte-Morales's role in this case, he's not a Government witness at this point, and should he ever become a defense witness, it would be under different circumstances than as a Government witness. ...

*       *       *

THE COURT: In other words, the only potential conflict that you can foresee apparently has to do with Mr. Olarte-Morales.

MR. MALMAN: Not on the part of Mr. Ives.  I just want to make sure on the part of the Government that they don't perceive a conflict, because there's nothing that I would ever do with Mr. Olarte-Morales as a defense lawyer which would not affect my relationship with him as a Government lawyer.

THE COURT: Mr. Troyer, do you have any reason to believe that Mr. Malman would be restricted in any way by virtue of his former status as a prosecutor from being completely unfettered in the decisions that he might make with respect to calling Olarte-Morales or examining Olarte-Morales?

5

MR. TROYER: Of course, I don't know of any reason on earth why he would want to or need to call Mr. Olarte-Morales to begin with. I think he's throwing a red herring into this, but I don't know of any reason why he wouldn't be able to talk to him.

And if he ever did think he would have a problem or a potential conflict, he could always bring somebody in to do that examination of Mr. Olarte-Morales. But I think we're talking about something that's never going to happen.

THE COURT: ... But from what I understand, it is the Government's position as to Olarte-Morales, and presumably as to everybody else, Mr. Malman is not restricted in entering a complete and unfettered defense on behalf of Marshall Ives.

MR. TROYER: That's correct, as far as I know. I don't' know what he's trying to do with Mr. Olarte.

*        *        *

THE COURT: So you've discussed all these matters with Mr. Malman, is that right, Mr. Ives?

THE DEFENDANT: Yes, your Honor.

THE COURT: And do you waive any conflict of interest that might exist between you and Mr. Malman by virtue of Mr. Malman's former status as a prosecutor?

THE DEFENDANT: Correct.

THE COURT: Okay. Is that a voluntary choice on your part or did somebody promise you something in order to get you to make that choice or did somebody threaten you, coerce you or force you in any way to make that choice?

THE DEFENDANT: No, your Honor. My hesitation was Mr. Troyer's possible objections if at some time Mr. Malman made the decision to.

*        *        *

THE COURT: So you're satisfied with Mr. Malman representing you in all respects.

THE DEFENDANT: Yes.

THE COURT: And is that a voluntary choice?

6

THE DEFENDANT: Yes.

THE COURT: Did anybody promise you anything in order to get you to make that choice?

THE DEFENDANT: No.

THE COURT: Did anybody threaten you, coerce you or force you in order to make that choice?

THE DEFENDANT: No.

THE COURT: So the Court finds that Mr. Ives has voluntarily and knowingly waived the conflict, if there is one. ...

[DE 14 (Govt.'s Answer), Ex. 2 at] 60-70.

On June 14 1995, trial commenced against Ives and two co-defendants. After three days of trial, Ives decided to change his plea to guilty. Under the terms of the plea agreement, Ives agreed to plead guilty to Counts I and II, while the Government agreed to dismiss Count VI, to recommend a two-level reduction for acceptance of personal responsibility, and not to seek and upward adjustment provided Ives fully recounted his relevant offense conduct to the United States Probation Office.

The Government proffered that Ives was engaged in a pattern of racketeering activity with the co-defendants from 1980 through December 6, 1993, and that as a racketeering predicate, Ives conspired with others to import into South Florida quantities of marijuana around the following dates: July 1984, 1100 pounds; February of 1985, 1,600 pounds; November of 1985, 2,700 pounds; August 1986, 600 pounds; February 1987, 1,605 pounds, and that "the overall amount of marijuana which is readily provable as to this defendant was just over 10,000 pounds of marijuana." [DE 14 (Govt.'s Answer), Ex. 3 at] 13-15.

The Government additionally proffered that the pattern of racketeering activity was further predicated upon a conspiracy to import cocaine between December of 1980 to August 5, 1990, and that from in or about 1985 through sometime in 1989, Ives, along with others, were engaged in a conspiracy to import cocaine from Colombia, South America to Exuma in the Bahamas, into the Southern District of Florida. *Id.* at 13-14. The Government further alleged that Ives was present in Exuma during discussion between the coconspirators and himself regarding importing cocaine, and that Ives oversaw a distribution of approximately 24 kilograms of cocaine. *Id.* at 15. It also asserted that Ives received monies, including transporting approximately $100,000 into Exuma, and received other monies, including $150,000, some of which was used for legal fees and expenses, "knowing they came from Obayo's family through Mr. Kabib, and knowing the monies that came from Obayo's family came from the proceeds of narcotics." *Id*. at 15.

After the proffer, Malman confirmed that the proffer was "what we stipulated to and what the Government foresees, whereas [sic] was readily provable as to Mr. Ives['s] participation in the conspiracy was concerned ... ." *Id*. at 16. Malman added that he was not certain about the proffered dates, at which time the prosecutor stated: "The cocaine issue, Your Honor, occurred somewhere in the time of the summer of 1984." *Id*. at 17. The Court then asked Ives whether he agreed that he "committed the acts described on or about the dates he stated," and Ives responded "Yes, Your Honor, with the one correction." *Id*. The Court accepted Ives guilty plea as knowing and voluntary, and sentencing was scheduled for June 14, 1996.

The Pre-Sentence Investigation Report ("PSI") assigned Ives a base offense level of 38, minus two points for acceptance of responsibility based on Ives' change of plea. With a total

offense level of 36, and category I criminal history, Ives faced a Guidelines sentence of between 188 to 235 months.  Ives, through Malman, filed objections to the PSI under seal.

On April 2, 1996, the Government filed a motion to reduce sentence pursuant to U.S.S.G. § 5K1.1.  On June 13, 1996, one day prior to sentencing, Ives filed a motion to withdraw his guilty plea, claiming his actual innocence of the charges.  At this time, Ives was being represented by attorney Richard Sharpstein, Esq.  The Government filed a notice and motion to withdraw its pending § 5K1.1 motion.  On June 14, 1996, the Court denied Ives motion to withdraw his plea and sentenced him to 188 months of imprisonment with 5 years of supervised release, a $15,000 fine, and a $100 special assessment.  The Court found that the offense level was 36, after a two-point reduction for acceptance of responsibility.  The Court additionally found nothing in the record to suggest any improper motive by the Government in withdrawing the § 5K1.1 motion.

Ives timely filed a direct appeal to the Eleventh Circuit Court of Appeals, arguing, *inter alia*, that he should have been permitted to withdraw his guilty plea as a result of an alleged conflict of interest with trial counsel, and that the district court erred in allowing the Government to withdraw the § 5K1.1 motion.  The Eleventh Circuit affirmed the conviction and sentence on May 20, 2003.  On July 15, 2003, Ives Petition and Suggestion for Rehearing En Banc was denied.

## MOVANT'S OBJECTIONS

### a. Conflict of Interest

Ives' first objection is to the Magistrate Judge's rejection of the argument that a conflict of interest existed due to Malman's relationship with Dexter Lehtinen, and/or Malman's former position with the U.S. Attorney's Office, in relation to the effective cross-examination of witnesses Olarte and Taboada. *See* DE 44 (Objections) at para. 1; DE 43 (Report) at 10-11. The Magistrate Judge based his determination on the Court of Appeals' finding on Ives' direct appeal, that "the district court did not abuse its discretion in denying Ives' Motion to withdraw his guilty plea." *See* DE 43 (Report) at 10-11 (citing and quoting *U.S. v. Ives*, Nos. 96-5143, 01-15105, slip op. (11th. Cir. filed May 20, 2003)). In reaching its conclusion, the Court of Appeals stated in pertinent part:

> Because Ives relies on an alleged conflict of interest to establish that he was denied the requisite close assistance of counsel,[3] he must demonstrate that a conflict of interest actually affected the adequacy of his representation. If there is a guilty plea involved, this Court looks at whether the attorney's actual conflict adversely affected the defendant's decision to plead guilty.
>
> In his attempt to show a conflict of interest, Ives argues that his trial counsel's representation of him contravened the principles set out in 18 U.S.C. § 207 and the regulations promulgated in furtherance of that statute. That attempt fails because no violation of the statute or regulations adversely affected the performance of Malman, who was Ives' principal trial counsel. Malman did not "participate[] personally and substantially," 18 U.S.C. § 207(a)(1)(B), in the investigation of Ives when he was a member of the United States Attorney's Office, and even if Malman's partner, Lehtinen, had "participated personally and substantially" in the investigation of Ives when Lehtinen was the United States Attorney, Ives has not shown that Lehtinen's having done so adversely affected the representation he received before he pleaded guilty.

---

[3] One factor that a district court must consider in deciding a defendant's pre-sentence motion to withdraw a guilty plea for "a fair and just reason" is whether close assistance of counsel was available to the defendant. *U.S. v. Siegel*, 102 F.3d 477, 481 (11th. Cir. 1996); Fed. R. Crim. P. 11(d)(2)(B).

> With respect to any other theories of potential conflict, we agree with the district court that Ives waived any conflicts of interest with respect to Malman at the June 15, 1995 *Garcia* hearing, and that Malman's relationship with Sapurstein created no conflict that adversely affected his representation of Ives.

*Ives*, slip op. at 3-5 (internal citations and quotations marks omitted).

Ives complains that the Magistrate Judge should not have relied on the foregoing analysis, because: (1) "[t]he Court of Appeals based its decision solely on the state of the record as it existed at the time of the appeal"; and, (2) "the opinion relied largely on Ives' argument that 18 U.S.C. § 207 was violated."  DE 44 (Objections) at para. 1.  Ives submits that in contrast, his current argument alleges an actual conflict of interest based on Malman's inability to call a number of defense witnesses and that "[n]one of this information was available to the appellate court."  *Id.*

The Government responds that Ives has not pointed to any additional facts indicating that the record concerning the alleged conflict of interest, or the waiver thereof, has changed since the time of the Eleventh Circuit's opinion and that further, Ives has not shown the need for an evidentiary hearing to establish additional facts.  *See* DE 57 (Govt.'s Response) at 2.  In addition, the Government submits that even if the Magistrate Judge was incorrect on whether the Eleventh Circuit ruled that there was no conflict of interest, the Magistrate Judge nonetheless rejected Ives' claim on the merits.  *Id.*  According to the Government, "[t]he mere fact that the Magistrate Judge agrees with the conclusions of the Eleventh Circuit does not mean that he failed to independently consider the merits of the claims."  *Id.* at 2-3.

After considering the foregoing arguments and the pertinent portions of the record, the Court is not persuaded that Ives has established a constitutional violation relative to his

ineffective assistance of counsel/conflict of interest claim.  In this regard, Ives must demonstrate an actual conflict of interest that adversely affected his attorney's performance.  *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (examining the issue in the context of an attorney's concurrent representation of three separately tried defendants where there was no objection at trial to the multiple representation); *Mickens v. Taylor*, 535 U.S. 162, 170-173 n. 5 (2002) (clarifying that for Sixth Amendment purposes, an "actual conflict" "is a conflict of interest that adversely affects counsel's performance."); *id*. at 174-176 (noting that the *Sullivan* standard–which excepts the *Strickland* requirement of showing a probable effect upon the outcome of trial–has been expansively applied to cases not involving the concurrent representation context and leaving open the question of whether *Sullivan* should be extended to cases involving successive representations.).  Further, in the context of a guilty plea, the Court looks at "whether the attorney's actual conflict adversely affected the defendant's decision to plead guilty."  *Pegg v. U.S.*, 253 F.3d 1274, 1278 (11th. Cir. 2001); *Cruz v. U.S.*, 188 Fed.Appx. 908, 913 (11th. Cir. 2006).

Ives' argument falls far short of satisfying these criteria.  Specifically, Ives submits that had the case proceeded to trial, Malman would have been unable to examine or cross examine a number of witnesses.  *See* DE 2 (Memo. in Support of 2255 Motion) at 12-14 (referring to six witnesses: Bilonick, Olarte, Roberts, Taboada, Rodriguez, and Sanar); DE 44 (Objections) at para. 1 (stating that Ives' conflict of interest argument is "based upon the inability to call witnesses for the defense.").  But Ives does not argue that Malman's alleged inability to call witnesses had any effect on his decision to enter a plea.  In fact, Ives contends that he was not aware of the conflicts.  *See* DE 2 (Memo. in Support of 2255 Motion) at 12 (stating that

"Malman never revealed that, if Appellant proceeded to trial, he would be placed in the situation where he could not examine or cross examine any of these witnesses."). Thus, insofar as Ives' decision to plead guilty is concerned, his perception of a conflict can only be characterized as speculative; the argument is based on hypothetical limitations Malman would have allegedly faced in the examination or cross-examination of certain witnesses. It is well established that speculative or hypothetical conflicts are insufficient to establish a constitutional violation. *See U.S. v. Khoury*, 901 F.2d 948, 968 (11th. Cir. 1990); *Sullivan*, 446 U.S. at 350 (1980) (holding that "the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."); *Burden v. Zant*, 24 F.3d 1298, 1305 (11th. Cir. 1994) (stating that "[w]here a defendant has raised a potential conflict of interest, but has failed to adduce proof of an actual conflict, we have consistently refused to find constitutionally deficient representation."). Here, even under Ives' speculative theory of a conflict, Ives has failed to articulate a nexus between Malman's alleged conflict and his decision to enter a guilty plea. Therefore, the Court finds that Ives has not established that Malman had an actual conflict of interest that adversely affected his performance.

**b. <u>Waiver</u>**

Ives next objects to the Magistrate Judge's findings: (1) with respect to Olarte and Taboada, that "[t]hese [conflict of interest] issues were *thoroughly discussed* at the hearing before Judge Ungaro-Benages, and any potential conflicts were waived by [Ives]; and, (2) with respect to Bilonick, Roberts, and Rodriguez, that "the alleged 'conflict' [arised] from Malman's status as a former prosecutor and/or his participation in the Noriega case, facts of which [Ives]

13

was aware, and a basis of potential conflict which [Movant] waived." *See* DE 43 (Report) at 11-12 (also noting that during the *Garcia* hearing Ives acknowledged his awareness of Malman's contact, by virtue of his former position, with <u>at least</u> Olarte and Taboada).  Ives objects to the notion that these issues were "thoroughly discussed", and states that they were not raised until the eve of trial, that he was not given the opportunity to discuss the conflict with independent counsel or given a continuance, that he was not fully informed of the conflict, and that the conflict issues related to attorneys Dexter Lehtinen, Juan Vargas, and Sonia O'Donnell were not discussed.  *See* DE 44 (Objections) at para. 2.  In sum, Ives states that "[t]here was not a sufficiently detailed or specific waiver of [Ives'] rights, no indication that he had been fully informed of them, or that he knowingly waived each and every right required by the law of this Circuit." *Id*.

In addition, Ives objects to the Magistrate Judge's statement that "[t]o the extent [Ives] may claim that any waiver was ineffective because he was not advised that he had the right to consult with another lawyer, [Ives] was a highly experienced criminal defense attorney (PSI ¶79) and was certainly aware of this right, and in fact had already privately retained three attorneys for his representation."  DE 43 (Report) at 12, n. 5.  Based on this language, Ives states that he objects to the Magistrate Judge's conclusion that he, as an attorney, should be held to a standard that is different from other criminal defendants.  *See* DE 44 (Objections) at para. 3.  According to Ives, "[t]he *Garcia* standards apply to **all** criminal defendants, regardless of their background or knowledge. . . .  There have been no facts alleged that [Ives] was aware of the scope of the conflict; much less that he was well versed in conflicts law and knew his rights." *Id*.

In response, the Government notes that the waiver issue has previously been adjudicated

by this Court, as well as the Eleventh Circuit, and that Ives offers nothing new in this regard. *See* DE 57 (Govt.'s Response) at 4-5. Further, the Government submits that there is nothing suggesting that the Magistrate Judge applied a standard to Ives that is different from that applied to any other criminal defendant. *Id*. at 5. "Rather, [[the fact that [Ives] was an experienced defense attorney]] is one of several factors that this Court should be free to consider in assessing the totality of circumstances surrounding the *Garcia* waiver." *Id*.

First, the Court agrees with the Government that the Report does not support the proposition that in assessing Ives' waiver under *Garcia*, the Magistrate Judge applied a standard different from that applied to non-attorney criminal defendants. The fact that Ives was "a highly experienced criminal defense attorney" was only a factor taken into account "[t]o the extent [Ives] claim[ed] that any waiver was ineffective because he was not advised that he had the right to consult with another lawyer." DE 43 (Report) at 12, n. 5 (also noting that Ives "had already privately retained three attorneys for his representation."). These considerations are proper given Ives' assertion that he was not allowed the opportunity to consult another attorney. *See* DE 2 (Memo. in Support of 2255 Motion) at 16; DE 44 (Objections) at para. 2; *U.S. v. Rodriguez*, 982 F.2d 474, 477 (11th. Cir. 1993) (noting that a defendant's background and experience are pertinent to a court's waiver determination under *Garcia*). Further, Ives' knowledge and experience as a criminal defense attorney are pertinent given his implied argument that he somehow may have been blind sided at the *Garcia* hearing, not being aware of its underlying facts at the time (*i.e.* Ives complains that the conflict issues were not raised until the eve of trial, that he was not given the opportunity to discuss the conflict with independent counsel, was not given the opportunity for a continuance, and that the conflict issues related to Lehtinen, Vargas,

15

and O'Donnell were not discussed).[4]  Any contention in this regard is without merit because, in addition to Ives' knowledge and experience as a criminal defense attorney, the record reflects that Malman disclosed and discussed his status as a former prosecutor and his participation in the Noriega case with Ives as soon as Ives contacted him.  *See* DE 14 (Govt.'s Answer), Ex. 2 at 60-63.

In addition, with respect to the sufficiency of the waiver, Ives points to nothing that would compel a result different from this Court's prior finding, or the Court of Appeal's determination that "[w]ith respect to any other theories of potential conflict, we agree with the district court that Ives waived any conflicts of interest with respect to Malman at the June 15, 1995 Garcia hearing."  *Ives*, slip op. at 4-5.  Thus, having considered the transcript of the *Garcia* hearing in light of the particular facts and circumstances surrounding the case, the Court finds that Ives was aware of the potential conflict of interest created by Malman's representation, realized that the conflict could affect his defense, and knew of the right to obtain other counsel. *See Rodriguez*, 982 F.2d at 477 (noting that "[t]he record should show, in some way, that the defendant was aware of the conflict of interest; realized the conflict could affect the defense; and knew of the right to obtain other counsel.").

**c. Prosecutorial Misconduct**

---

[4] With respect to this last contention, the Court notes that Ives did not address Vargas and O'Donnell in the § 2255 Motion.  *See* DE 1(§ 2255 Motion); DE 2 (Memo. in Support of 2255 Motion).  As to Malman's relationship with Lehtinen, the former Acting United States Attorney, the Magistrate Judge rejected Ives' argument of a conflict.  *See* DE 43 (Report) at 11-12; *also Ives*, slip op. at 4 (noting that "even if . . . Lehtinen, had 'participated personally and substantially' in the investigation of Ives when Lehtinen was the United States Attorney, Ives has not shown that Lehtinen's having done so adversely affected the representation he received before he pleaded guilty.").

Ives also objects to the Magistrate Judge's summary rejection of his claim of prosecutorial misconduct.  *See* DE 44 (Objections) at para. 4.  In this regard, the Magistrate Judge outlined Ives' burden of proof as follows: "(1) the prosecutor engaged in improper conduct, and (2) the conduct affected the substantial rights of the defendant."  DE 43 (Report) at 12.  With respect to this second element, the Magistrate Judge concluded: "[b]ecause the 'substantial right' which [Ives] claims was violated was his right to conflict-free representation, and the Court has rejected that claim, this claim also fails."  *Id*.  However, Ives maintains that his "[prosecutorial misconduct] claims are totally independent of the conflict issue, and should not be considered contingent, as the Magistrate has done."  DE 44 at para. 4.

In response, the Government notes that despite Ives' asserted independence of his prosecutorial misconduct claim, the only basis for the claim is the alleged conflict of interest. *See* DE 57 (Govt.'s Response) at 5.  Further, the Government submits that to the extent Ives suggests that the prosecutorial misconduct claim is independent from the conflict of interest claim that was presented on direct appeal, Ives would be precluded from asserting such an independent claim based on the procedural default doctrine.  *Id*. at 6; *e.g., Withrow v. Williams*, 507 U.S. 680, 720-721 (1993) (Scalia, J., concurring in part and dissenting in part) (noting that "federal courts have uniformly held that, absent countervailing considerations, district courts may refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal.  Thus, a prior opportunity for full and fair litigation is normally dispositive of a federal prisoner's habeas claim.  If the claim was raised and rejected on direct review, the habeas court will not readjudicate it absent countervailing equitable considerations; if the claim was not raised, it is procedurally defaulted and the habeas court will not adjudicate it absent

countervailing equitable considerations ( *e.g.,* actual innocence or cause and prejudice).")
(internal citations omitted).

Having considered Ives' argument, the Court agrees that Ives' claim of prosecutorial
misconduct fails because it is based on the rejected conflict of interest claim. Specifically, the
only asserted basis for Ives's claim of prosecutorial misconduct is his constitutional right to
counsel untainted by a conflict of interest. *See* DE 2 (Memo. in Support of 2255 Motion) at 1-9
(claiming that the Government failed to timely disclose to the Court and Ives the actual conflict
of interest of which it was aware and that it later "actively misled the Court throughout the
appellate and post conviction process as to the state of the record on these matters."). Therefore,
because Ives has failed to establish a constitutional violation with respect to his conflict of
interest claim, the claim of prosecutorial misconduct also fails. *See Sexton v. Howard*, 55 F.3d
1557, 1559 (11th. Cir. 1995) (outlining the two-prong test for prosecutorial misconduct: (1) the
conduct at issue must be improper; and, (2) it must prejudicially affect the defendant's substantial
rights).[5]

**d. <u>Withdrawal of 5K1.1 Motion</u>**

Ives next objects to the Magistrate Judge's conclusion that the issue of whether the
prosecutor improperly withdrew the § 5K1.1 motion is procedurally barred as a result of the
Eleventh Circuit's determination on Ives' direct appeal. *See* DE 44 (Objections) at para. 5; DE
43 (Report) at 13. Ives submits that the issue on appeal was different from the issue now before
the Court. Specifically, Ives states that the issue on appeal was that "[Ives] should be allowed to

---

[5] The Court has also considered the Magistrate Judge's findings with respect to the
alleged misrepresentations by AUSA Troyer. *See* DE 43 (Report) at 12 n. 7. No such
misrepresentations are evident from the record.

withdraw his plea based on the Government's withdrawal", while the claim herein is that the "Government was without statutory authority to withdraw a U.S.S.G § 5K1.1 [motion]." DE 44 (Objections) at para. 5. The Government responds that "[Ives'] argument is incorrect and mischaracterizes his own appellate brief and the Eleventh Circuit's opinion [because] [a]ccording to [Ives'] own appellate brief, the issue presented was 'whether the trial court erred in allowing the government to withdraw the 5K1.1 motion that it had previously filed on [Ives'] behalf.'" DE 57 (Govt.'s Response) at 6.

On Ives' direct appeal, the Court indicated that this case was "materially indistinguishable" from *U.S. v. Carlson*, 87 F.3d 440, 447 (11th. Cir. 1996), where the Court concluded that "the defendant 'could not have reasonably understood that the government would accept as substantial assistance less than what it bargained for, including the opportunity to use him as a viable witness.'" *Ives*, slip op. at 6 (citing *Carlson* at 447). Similarly, the Court indicated that "Ives moved to withdraw his guilty plea, thereby precluding himself from being an effective witness for the government and undermining the value of any cooperation he had rendered up to that point." *Id*. at 7. Accordingly, the Court found that "the district court did not err in allowing the government to withdraw its § 5K1.1 motion." *Ives*, slip op. at 7. Based on the Eleventh Circuit's determination, this Court agrees that Ives' claim–*i.e.* that the Government was without statutory authority to withdraw the § 5K1.1 motion–is procedurally barred. *See Withrow*, 507 U.S. at 720-721.

Moreover, the Court is not persuaded that Ives has established ineffective assistance of

counsel claims with respect each of his pre-appeal attorneys.[6]  Ives submits that these unspecified attorneys were ineffective because they allowed him to be debriefed without their presence and that this caused "the miscommunication" resulting in the Government's withdrawal of the § 5K1.1 motion.  *See* DE 2 (Memo. in Support of 2255 Motion) at 19 (stating that he was debriefed prior to sentencing on numerous occasions without the opportunity to have counsel present and that counsel did not attend despite his request.).[7]  Ives' claim can only be characterized as vague

---

[6] As stated in the Report:

> In order to obtain relief based on ineffective assistance of counsel, Movant must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland v. Washington*, [4]66 U.S. 668, 688, 694 (1984).  "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all circumstances, and the standard of review is highly deferential."  *Huynh v. King*, 95 F.3d 1052, 1056 (11th. Cir. 1996) (citing *Strickland*, 466 U.S. at 689).

> Movant has the burden of proving "that counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."  *Id*.  Reviewing courts "should presume effectiveness and should avoid second-guessing with the benefit of hindsight."  *Horton v. Zant*, 941 F.2d 1449, 1460 (11th. Cir. 1991).  "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential."  *Huynh v. King*, 95 F.3d at 1056 (11th. Cir. 1996) (citing *Strickland*, 466 U.S. at 689).

DE 43 (Report) at 13.

[7] Ives cites *U.S. v. Ming He*, 94 F.3d 782 (2nd. Cir. 1996) for the erroneous proposition that the "Second Circuit recognized that there is a constitutional right to the assistance of counsel during debriefing sessions with the Government."  *Id*.  In fact, the Second Court specifically limited its ruling by stating:

> [W]hile we do not reach or decide appellant's constitutional argument [that the Sixth Amendment entitles him to the assistance of counsel during debriefing], the government's standard practice in this district of conducting debriefing interviews outside the presence of counsel is inconsistent, in our view, with the fair administration of criminal justice.

and conclusory, inasmuch as it, *inter alia*, assumes that the Government withdrew the motion as a result of an unidentified "miscommunication" and not because as the record reveals, he "moved to withdraw his guilty plea [claiming actual innocence and thereby] undermining the value of any cooperation he had rendered up to that point." *Ives*, slip op. at 7.  Thus, even if the Court were to accept that counsel's performance fell below an objective standard of reasonableness, Ives has not established that there is a reasonable probability that, but for counsel's performance, the result of the proceeding would have been different (*i.e.* that the Government would not have withdrawn the § 5K1.1 motion despite Ives' attempt to withdraw the guilty plea).

**e. Applicability of Sentencing Guidelines**

_____Ives also objects to the Magistrate Judge's finding that counsel was not ineffective for failing to challenge the application of the Sentencing Guidelines to Ives.  *See* DE 44 (Objections) at para. 6; DE 43 (Report) at 14.  Ives' argument is that the Guidelines were inapplicable to him because his active participation in the alleged conspiracy ended prior to November 1, 1987, the Guidelines' effective date.  *See* DE 2 (Memo. in Support of 2255 Motion) at 22-23 (citing *U.S. v. Peeples*, 23 F.3d 370 (11th. Cir. 1994)[8]).  Ives states that "in 1987, the record is clear that he had

---

Consequently, we exercise our supervisory authority to bring it to an end, and vacate the judgment in the instant case and remand for resentencing.

*Ming He*, 94 F.3d at 785.

[8] *Peeples* states in pertinent part:

As a general proposition, a conspirator is responsible for the conspiracy's activities in which he is involved, and for drugs involved in those activities, and for subsequent acts and conduct of coconspirators, and drugs involved in those acts or conduct carried on in furtherance of the conspiracy which is reasonably foreseeable to him.

taken affirmative steps to withdraw from the conspiracy, and certainly was not conducting activity to further the conspiracy." *Id*. at 23.

However, as the Magistrate Judge noted, Ives admitted that "from 1980 through December 6, 1993, [he] was engaged in a pattern of racketeering activity with the defendants with whom he is indicted." *See* DE 14 (Govt.'s Answer), Ex. 3 at 13, 16-17. Ives specifically admitted to being a co-conspirator in (1) a conspiracy to import marijuana from December 1980 to August 1990; and, (2) a conspiracy to import cocaine from 1985 to 1989. *Id*. at 13-14, 16-17; DE 2 (Memo. in Support of 2255 Motion), Ex. "1" (Indictment) at 13-14 (racketeering acts nos. 9-10). In addition, Ives admitted direct participation in several importations of marijuana from January, 1984 to February, 1987, being present during the discussions in furtherance of the marijuana and cocaine conspiracies, and receiving and distributing monies in furtherance of the conspiracy. *See* DE 14 (Govt.'s Answer), Ex. 3 at 14-15, 16-17. Moreover, Ives has not identified what portion of the record supports the proposition that he withdrew from the conspiracies by the Guidelines' effective date. *See U.S. v. Pippin*, 903 F.2d 1478, 1481 (11th. Cir. 1990) (stating that if an alleged conspirator can meet his burden of proving withdrawal from the conspiracy before November 1, 1987, then the ex post facto clause may bar application of the

---

The ending date of an indictment does not govern whether an offense should be classified as a straddle crime. RICO is a "straddle" crime to which the guidelines apply. The defendants are subject to guideline sentencing if they participated in a continuing crime, such as a conspiracy that begins before and continues after the effective date of the guidelines.

The scope of the agreement must be determined individually from what was proved as to the defendant.

*Peeples*, 23 F.3d at 373 (internal citations and quotation marks omitted).

Guidelines, notwithstanding the fact that the conspiracy may have continued beyond this date. . . . The alleged conspirator demonstrates withdrawal by proving that he (1) undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, and (2) either communicated those acts in a manner reasonably calculated to reach his coconspirators or disclosed the illegal scheme to law enforcement authorities.) (internal quotation marks omitted).

Based on the foregoing, the Court agrees that Ives has failed to establish that his counsel's performance was unreasonable with respect to the application of the Sentencing Guidelines. Even if such an argument would have been advanced by Ives' counsel, there is no reasonable probability that the same would have been successful.  Specifically, the admitted conspiracies continued well beyond the Guidelines' effective date and Ives' withdrawal argument is not supported by the record.

**f. Proper Version of the Sentencing Guidelines**

Ives' next objection is to the Magistrate Judge's rejection of Ives' claim that counsel (Mr. Sharpstein) was ineffective for failing to object to the application of the improper version of the Sentencing Guidelines.  *See* DE 44 (Objections) at para. 7.  Specifically, Ives argues that even if the Sentencing Guidelines were applicable to him, the version in effect until November, 1990, rather than the one in effect at the time of sentencing in 1996, should have applied and that it would have resulted in a lesser sentence for the RICO conspiracy conviction.  *See* DE 2 (Memo. in Support of 2255 Motion) at 24-25; DE 43 (Report) at 15-16.  However, as the Government and the Magistrate Judge have noted, in pleading guilty to counts one and two of the indictment, Ives admitted that he was engaged in a pattern of racketeering activity with the co-defendants

from 1980 through December 6, 1993.  *See* DE 14 (Govt.'s Answer), Ex. 3 at 13, 16-17.

Therefore, application of the Sentencing Guidelines in effect until November, 1990 would have

been improper.  *See U.S. v. Dodds*, 347 F.3d 893, 900 n. 9 (11th. Cir. 2003) (stating: "[t]he

general rule is that a defendant is sentenced under the version of the Guidelines in effect on the

date of sentencing [*i.e.* June 14, 1996], barring any *ex post facto* concerns.").  Therefore, Ives has

not demonstrated that cannot demonstrate that counsel was ineffective for failing to advocate for

the application of the 1990 Guidelines Manual.

**g. <u>Statute of Limitations</u>**

  Ives also objects to the Magistrate Judge's rejection of the argument that Malman was

ineffective for failing to raise a statute of limitations defense.  *See* DE 44 (Objections) at para. 8.

Specifically, Ives argues that "the uncontroverted facts were that [Ives'] participation in any

RICO conspiracy ended, at the latest, in the summer of 1987 [and that he] was not indicted until

December, 1993, over 6 ½ years after the [Ives'] offense ended."  DE 2 (Memo. in Support of

2255 Motion) at 31-32 (citing *U.S. v. Starrett*, 55 F.3d 1525 (11th. Cir. 1995) in support of the

propositions that: (1) the limitations period for a substantive RICO offense (18 U.S.C. § 1962(c))

is five years; (2) that the period begins to run from the date of the last act of racketeering activity

alleged in the indictment and proved at trial; and that (3) for a crime to be brought within the

limitations period under § 1962(c), the government must prove that at least one predicate act was

committed within five years of the date the defendant was charged in the indictment).

  The Magistrate Judge determined, and the Court agrees, that Ives' argument is foreclosed

by his admissions at the plea hearing.  *See* DE 43 (Report) at 17.  As previously noted, Ives

admitted that "from 1980 through December 6, 1993, [he] was engaged in a pattern of

racketeering activity with the defendants with whom he is indicted", and as predicate

racketeering acts, that he was a co-conspirator in (1) the conspiracy to import marijuana from

December 1980 to August 1990; and, (2) the conspiracy to import cocaine from 1985 to 1989.

*See* DE 14 (Govt.'s Answer), Ex. 3  at 13-14, 16-17; DE 2 (Memo. in Support of 2255 Motion),

Ex. "1" (Indictment) at 13-14 (racketeering acts nos. 9-10).  Ives has not pointed to anything in

the record in support of his withdrawal argument and the Court will not second guess Malman's

performance based on Movant's bare assertions.[9]

**h. RICO Predicates**

Ives next objects to the Magistrate Judge's rejection of the argument that counsel was

ineffective for failing to challenge the indictment on the basis that the predicate racketeering acts

alleged "the same exact conspiracy" to import narcotics.  *See* DE 44 (Objections) at para. 9; DE 2

(Memo. in Support of 2255 Motion) at 33.  Ives submits that a motion to dismiss would have

been successful in this regard.  *Id.* at 34.  The Magistrate judge found that the indictment satisfied

the pleading requirements for a RICO conspiracy, noting that:

> Racketeering Act No.6, part of 'The Alarcon Importations' alleges that [Movant]
> conspired with others to import cocaine into the United States from 'in or about January,
> 1983 to in or about the Fall of 1984.  Racketeering Act No.9, part of 'The Abello
> Importations' alleges that [Movant] conspired with some of the persons named in

---

[9] In his Objections, Ives for the first time advances the argument that his "alleged admissions at the plea hearing would not have had any effect on counsel's duty to investigate **prior** to that hearing.  There is no allegation in the record by former counsel that he was told this information prior to the plea . . . ."  *See* DE 44 (Objections) at para. 8.  Ives fails to acknowledge that the "information" he refers to are the facts adduced at the plea hearing, which simply track the allegations in the indictment.  *Compare* DE 14 (Govt.'s Answer), Ex. 3 at 13-17, *with* DE 2 (Memo. in Support of 2255 Motion), Ex. "1" (Indictment) at 8, 13-14; *also U.S. v. Torkington*, 812 F.2d 1347, 1354 (11th. Cir. 1987) (stating that "[u]nder Fed. R. Crim. P. 12(b) an indictment may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial.").

Racketeering Act No. 6, as well as others, to import into the United States marijuana from 'in or about December, 1980 to on or about August 5, 1990.

DE 43 (Report) at 18.

Having considered the relevant portions of the indictment, the Court agrees with the Magistrate Judge's determination that the pleading requirements under RICO were satisfied; there is no reasonable probability that a motion to dismiss would have been successful on this ground. *See, e.g., U.S. v. Starrett*, 55 F.3d 1525 (11th. Cir. 1995) (outlining the elements that must be proven under 18 U.S.C. § 1962(c),(d)); *U.S. v. Sharpe*, 438 F.3d 1257, 1258-59, 1263 (11th. Cir. 2006) (noting that the dismissal of an indictment under Fed. R. Crim. P. 12(b)(3)(B) is subject to reversal where the "'factual allegations in the indictment, when viewed in the light most favorable to the government, were sufficient to charge the offense as a matter of law.'") (quoting *U.S. v. deVegter*, 198 F.3d 1324, 1327 (11th. Cir. 1999)).  Accordingly, counsel cannot be deemed ineffective for failing to challenge the indictment as Ives contends.

### i. Evidentiary Hearing

Finally, Ives objects to the Magistrate Judge's recommendation that his § 2255 Motion be denied without an evidentiary hearing. *See* DE 44 (Objections) at para. 10.  The Government responds that Ives has not indicated what he would show at an evidentiary hearing or why it is necessary in light of the lengthy record in this case. *See* DE 57 (Govt.'s Response) at 9.  "In a section 2255 proceeding, the district court must accord the movant an evidentiary hearing unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Anderson v. U.S.*, 948 F.2d 704, 706 (11th. Cir. 1991) (quoting *Holmes v. U.S.*, 876 F.2d 1545, 1552-53 (11th. Cir. 1989) (internal quotations omitted); *also Lynn v. U.S.*, 365 F.3d

26

1225, 1239 (11th. Cir. 2004) (concluding that an evidentiary hearing was not required because the movant's allegations were conclusory).  In this case, there is a well-developed record, cited herein, conclusively showing that Ives is not entitled to the relief he requests.  Therefore, an evidentiary hearing is not required.

Accordingly, having made a *de novo* determination of the objected portions of the Report and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that the Magistrate Judge's Report (DE 43) is RATIFIED, AFFIRMED AND ADOPTED.  It is further

ORDERED AND ADJUDGED that Ives's Motion (DE 1) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 18th day of December 2006.

URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided:
Counsel of Record